On the calendar, you have two government employee cases that are being submitted on the briefs and therefore will not be argued. And we have the unusual situation of having four patent cases argued in one morning. It's not uncommon to have two of them, but we have two paired, same patent, same parties, and we have one from the patent office. So anyone who doesn't want to hear patent appeals is free to leave without any demerits. First case is Liebel-Flarsheim v. Medrad, 06-1156, Mr. Chambers. Good morning, Your Honors. May it please the Court, I'd like to begin with the 06-1156 patent and show how the district court erred in its analysis and then show what a proper analysis, the result of a proper analysis would give us. With respect to written description, we start with the fundamental proposition that written description is determined as of the filing date of the original application. In this case, the original 110 application filed on June 7, 1991. The construct is to take the later added claims and place them in the original 110 application as though originally filed. Parenthetically, we have just divisions here, so there is a common application from 110 through to the 669 and 261 patents, so we can compare the asserted claims in those patents to the common specification. This construct gives a defined, discrete inquiry into whether or not the asserted claims are described by the specification. Now, in the district court, rather than doing that, the district court ignored entirely this starting point and began by comparing Medrad's commercial device, which appeared some 18 months later, after the filing date of the June 7, 1991 filing date, with the preferred embodiment in the specification, and concluded... You used the expression preferred embodiment. Is there any other embodiment or any disclosure at all of a jacketless device? There is not. So, why isn't there a lack of written description as the court held? Fact question. Limited standard of review. Because the written description inquiry does not inquire as to subsequent developments. The inquiry is are the asserted claims described by the patent specification? And whether it's a single embodiment or multiple embodiments, there is no contest in this case but that, there is no contention but that, the asserted claims are described by the patent specification. But the asserted claims have been construed by this court to include the jacketless device, right? The asserted claims have been construed not to be limited to a jacketed device. At your request. You took us there. Well, we opposed Medrad's attempt to take... You took us to the jacketless configuration, right? Now you have to show us that you've enabled that. Where did you enable a jacketless device at any point? We disagree that we have to show that we enabled... Well, you're wrong on that because you do. You have to enable the entire scope of the claims. You took us there. Now how are you going to show us that you have enabled something beyond the jacketed pressure device? We would submit that it's the law of this court that you do not need to disclose or enable every future inconceivable embodiment of the invention. You have to enable the entire scope of the claim. We now agree, perhaps with 20-20 hindsight we wouldn't so agree, but we now agree that jacketless devices are within the scope of the claims. How have you enabled that? We enabled the one device that we disclosed. You have to enable the entire scope of the claims. That's replete throughout our case law. Yes, we have an Engel case which didn't focus on the question of the entire scope of the claims in which there was some language that said something different. But it's clearly part of our law that you have to enable the full scope of the claims. Now where have you done that? It depends on what you say are the full scope of the claims because once you go down that road, we've always focused here on the absence of a pressure jack, but there are other elements in this claim. When there's a connection mechanism, means for connecting, the RAM, then the argument would be well you have to enable a different form of that than what you've disclosed. And there's a cylindrical syringe and then that argument would be well then you'd have to enable a different form of that syringe. And the full scope of the invention, to my mind, you see that more on the chemical and biotechnological side in the unpredictable arts, but in the mechanical and predictable arts, it's generally not. Isn't that just another way of saying that it's true you don't have to enable every single conceivable embodiment, but what you have to do is to enable such embodiments as to which somebody of reasonable skill in the art would be able to enable or create without undue experimentation. Pretty standard doctrine. And that principle, it seems to me, cuts across all arts. It's just that it's more frequent, perhaps, more frequently satisfied in mechanical arts. Isn't that really the doctrine that we're looking at here? Well, the problem is how can a patentee envision all of these various, whatever variations might come up. But you've focused on one particular because you wanted to dominate the competitive device. I mean you've focused on a jacketless device. So we're really talking here not about a generic claim with a whole flock of possible species and have they all been enabled. Here it's you focused on the jacket. So it's either or. And or, without, hasn't been enabled. I would disagree with that, Your Honor. In the 669 patent, what we focused on is a method of front load, which includes inserting the syringe, the rear end into an opening, a twist, a turn, a fraction of a turn, engaging the plunger with the ram, and then proceeding to do an injection with a pre-programmed rig. But the district court here, based on testimony, Faygo's testimony, among others, that a jacketless device would take an unknown amount of time to develop, there's a finding on a factual issue that you have not enabled a jacketless device. How do we get around that? The problem in the district court was that all of that testimony was directed to enablement, not written description, but how do you get around it is that there's nothing unusual about that testimony. I mean, in any commercial situation, you're going to have to do things that engineers do in order to make a product. You've got a commercial product here, you have pressures you have to deal with, it's a regulated market, you have things that you have to do with, there's nothing in any of that testimony that says what we're going to do here, whether we're going to make the syringe stronger or whatever, is anything more than what engineers always do. How about the other pair of patents, Mr. Chambers, the syringe sensing patents? On those patents, it's a little unclear exactly what the written description defect was. In those patents, you have an injector, and part of the concept of those patents is that they will accommodate prefilled syringes that have a plunger at a different position than at the end when it's a fully filled injector. And what that patent says is that in one embodiment, figure 6E and figure 6F, you can input a capacity to tell the injector that we have a syringe here that doesn't have, for example, 100 milliliters, it only has 50 milliliters. Physical indicia. I'm sorry? We're talking about physical indicia, right? At the top of column 4, it says as an alternative to that manual input, you can have an automatic input based on physical indicia on the syringe or on the extender. The physical indicia, that's a description of something of a physical nature which indicates something about the syringe. These three lines, correct me if I'm wrong, are the only description in that patent relating to physical indicia, and the district court limited, therefore, the interpretation, well, the disclosure to just what you said, indicating the length of the extender. No, I don't believe that's correct, because I think in the earlier claim construction ruling, it wasn't limited to the length of the extender. The physical indicia was described as describing the syringe or the length of the extender, but we've gone ahead and shown how throughout that whole patent, there's a direct relationship between the length of the extender and syringe capacity. At the bottom of column 3, there's a discussion of the interrelationship of when the manual method, you input the capacity, and then the computer changes that to an offset value, and then you proceed with the computation and location based on that offset value. What we're saying is that you can do the same thing by a direct reading of capacity or by reading a physical extender. It's all the same because it all relates to capacity. What about the anticipation by the 858 patent? The problem with the 858 patent is that it has no description whatsoever of capacity. The whole point of the syringe-sensing patent… Does that embody the accused device? The 858 patent? Yeah. Some of the commercial products, and I don't know if they're 858 patent or not, but some of the commercial products have sensors on them, and that's why we're here, that tell you what syringe is on there in terms of different capacities. But if the 858 patent doesn't anticipate, how can the device embodied by it infringe? What I'm saying is the 858 patent has no teaching, no suggestion, no recitation at all that what you're sensing has in any way a relationship to capacity. Why do you say that, though? It seemed to me, and the other side is arguing, that the various capacities described by the 858 patent encompass the capacity… Wrong word. The ability to determine capacity by calculation. Why isn't that so? In the 858 patent? Yes, they argue that. Why isn't that so? Because the 858 patent looks at things such as manufacturing and locking numbers, which has nothing to do with capacity. Tool cavity numbers. Recommended contrast media flow rates and pressures. Loading and injection sequences. None of that has to do with determining capacity. A typical type of syringe would, right? Not necessarily. But a syringe could. I mean, if you have a syringe of a particular type, it has a particular size, volume, and presumably you could infer capacity, wouldn't you? I don't think you can in terms of what is required for anticipation. A type of syringe could mean nothing more than a plastic or glass syringe so that you would set your pressure limit at a different point so that you didn't fracture your syringe. Anticipation requires much more than that. And what we're saying is in the 858 patent, there's nothing that relates anything to a determination of capacity. There's nothing in here that talks as we do in our patents regarding a prefilled syringe and having an injector that can operate with different prefilled syringes of different capacities. Your capacity to argue is coming to an end. You can finish your last minute or we can save it and we'll give you your full three minutes rebuttal if you like. The point I wanted to make is that once you say written description requires, once you say that the claim is not restricted by what's disclosed in the specification, the claim is what it was, it's not restricted by what's disclosed in the specification, then it can be valid one day and then whenever a new product comes out later, which is different, then is that claim invalid like a written description because the specification doesn't disclose it. I'll give you three minutes of rebuttal. Thank you. Mr. Chambers, Ms. McGuff. I could have just a moment. I wanted to get this up here so the court could see it. Looks very threatening. Okay. Looks threatening. I'll try to point it over this way. Yeah, that way. There's no good direction to point it. May it please the court, I'm Tom McGuff representing MedRat. The Appalachian Cross Appellant. There are, this is maybe an unusual case in that you have two pairs of patents that follow very similar trajectories as they evolve. You have the front load patents and you have the syringe sensing patents. And in both cases, those patents started with narrow applications, narrow specifications, narrow claims. Front load, narrow specification, all relating to a pressure jacket, claims relating to a pressure jacket. On the syringe sensing side, as the court pointed out, two or three line reference to physical indicia in the specifications and the related claim, including an extender. Our client, MedRat, introduced products and then LF amended both sets of patents to capture those products. Now let me hasten to add, there is nothing per se wrong with that. That's permissible, but what it does is it puts the court right into the middle of the written description and enablement question and the question of priority. And that is where the district court went after, upon remand after the last time it was here. The section 112, which is where the analysis really should begin and end and did for the district court. Mr. Chambers says the district court ignored the rule. I can't count the number of times the district court referred to section 112. It says the specification shall contain a written description of the invention and of the manner and process of making and using it in such full, clear, concise and exact terms, etc. The district court asked to enable a person skilled in the art to which it pertains or with which it is most nearly connected to make and use the same. Now, this is the device. If there are conflicting testimony on enablement, where is this court? Enablement, Your Honor, is a question of law which incorporates questions of fact. And the district court did, I think, an admirable job of going to what Mr. Chambers says is conflicting testimony about the nature of the experimentation that would be necessary. Mr. Chambers says that there was nothing unusual about the inventor's testimony. Quite frankly, we believe it's quite unusual for an inventor, after seeing a competitor's product, to write a memo that says, you know, we looked at this product, we thought about doing that, but we thought it was too risky. Are you talking about the first two patents? The Faygo, the front load. But you're not talking about the syringe-sensing patents. Well, enablement only, the district court didn't rule on the enablement issue. Well, I guess that depends on how you read the district court's opinion in that case. The district court alludes to enablement and, of course, is treating this as a 112. Yes, and you're right, Your Honor. The district court, in regard to the syringe-sensing, does allude to enablement, but it comes down on written description. And if I could go to the syringe-sensing for a minute, because that's a little more esoteric than the front load. This is the injector. This is the pressure jacket. This is the faceplate. Now, in order to understand the syringe-sensing issue, you have to understand the narrow problem that LF was addressing in that original patent. Injectors control a ram that pushes the fluid out of a syringe. The injector has to know how far and how fast to push the ram. And, therefore, injectors from the time of the Hirschman patent had control systems that automatically controlled how far and how fast you pushed that ram. The question was, where does the injector learn the information it needs to know to do that? One way, which is referenced in the syringe-sensing patent, is the 612 and 197. Repeatedly, it's for the operator to key in that information. The 612 and 197 patent also, though, indicate at figure 5 and column 11, lines 6 through 24, that if you want to change the size of the syringe, what you do is you change the size of the faceplate, and that this machine will read syringe size off the faceplate. Obviously, this pressure jacket is customized to fit one size syringe. This size right here. It's mounted on a faceplate. If you want to use a different size syringe, you change the faceplate, put it on, and the machine will read that faceplate and know what size syringe it's in. Now, that works fine as long as you can use an unfilled syringe and just fill the syringe up to any amount you want, and the operator types in the amount. But what happens, Your Honor, if you use a prefilled syringe? These are two prefilled syringes. The white part at the bottom is the extender. These are two syringes the same size, different amounts of fluid. They would fit into the same faceplate, but the machine needs to know, under this system, whether or not there's an extender in the syringe or not. And so, at the bottom of column 3 and at the top of column 4, addressing this narrow issue of the extender, what the patent says, after describing the problem, is that the machine can query the operator as to whether there's an extender, or, alternatively, the offset value, the offset value is nothing but the length of the extender. The offset value may be automatically computed by detecting physical indicia on the syringe or extender, which indicate the length of the extender. That's the extent of the disclosure. Now, the district court found, we believe, correct, that that doesn't describe a system like MedRat's system. What are you showing us right here? What is that? This is LF's machine, the CT9000, with a faceplate attachment from which this faceplate has magnets in the back. Which is what, the accused device? No, no, no, this is not the accused device. This is an embodiment of the claim. And in this device, it reads syringe size off the faceplate. And the only variable it reads from the extender, or would read from the syringe itself, is the length of that extender. Now, we'll point out, this is a paper patent. LF has never produced a syringe or an extender that can be read, or a machine that will read the syringe or the extender. The 858 patent, actually, which Judge Lori, you mentioned, how can the 858 patent, if it doesn't anticipate, how can it infringe? The 858 patent describes the MedRat system in which, from indents on the syringe, it's commercialized, indents on the syringe, you put the syringe into the machine, and it knows the criteria of the syringe. And Judge Brazen, as you pointed out, the disclosure in the 858 patent, they like to say, well, it says, dates and tool cavity, manufacturing information. At page 45 of the district court's opinion, she sets out what the 858 discloses. It discloses a system for transmitting syringe information from the syringe, not from a faceplate, not from operator input, to an injector controller. That's the basic system that controls the ramp. Examples of the information include the dimensions of the syringe, the content, manufacturing information, loading and injection sequences, the type of syringe. Now, it does not, we will concede, say, the capacity of the syringe. And Mr. Chambers makes a point of that. But what the district court said about that is, if you look at the disclosure that they are relying on in their 612-197 patent, all it talks about is physical indicia on the syringe which indicate the length of the extender. This is where the district court says, what's good for the goose is good for the gammon. If you want the court to read that language at the top of column 4 broadly enough to disclose capacity and other things about the syringe, then most certainly that language in the 858 patent has got to be read equally broadly. And when you're talking about the type of syringe, the dimensions of the syringe, it's apparent that you are talking about the information that the controller needs, and that includes the capacity. So your position, I wasn't clear from what you said a moment ago, but your position is that this is all information which can be used to calculate capacity? The dimensions of the syringe are going to tell you what the capacity is. And yes, one could hypothesize other things that you could do with a syringe, wall thickness or something that might, but for one skill in the art, if you disclose that you are going to inform the machine of the dimensions of the syringe, they would understand that you possess the capacity to determine the capacity of the syringe. Not so with the language at the top of column 4. One skilled in the art simply can't get there when one understands the faceplate, the interaction between the faceplate and this machine. What in the 858 would disclose the limitation of causing the motor to move and tracking the location of the motor? Presumably, and I know this isn't necessarily your position, but we'll just assume for the moment that what we're talking about is the movement of the armature. The movement of the ram, if you will. That's what these machines do. Yeah, but the motor causes the ram to move, and therefore when we're tracking the movement of the motor, at least immediately we're talking about something that causes the ram to move. But in any event, what is it in the 858 that... The 858 doesn't claim that that's... that was the Hirschman patent, Your Honor. These machines have done that since powered injectors first came into play. This machine did it. The MedRads machines did it. The whole point of the powered injector is to be able to input information and have the ram move forward at a particular... to a particular point at a particular speed. And so, for example, the 858 patent talks about, and this is again at page 45 of the district court's opinion, the sensor reads the encoding device and forwards the associated signals to the injector controller, which then interprets the signals and modifies the function of the injector apparatus accordingly. That's what these machines do. They inject a certain amount of fluid into the patient over a certain period of time. So, Hirschman... Are you saying that's inherent in the operation of the machine, that it has to be one way or another tracking the motor? It's clearly prior art, Your Honor. The Hirschman patent, that's how the... Dr. Hirschman testified. I think his words were, that's simple potentiometer technology. Yeah, okay. I had to go look up the word potentiometer, but to him that's simple potentiometer technology. And so that, when they said, that's the other distinction they make with the 858 patent, is that it supposedly doesn't specify that it's controlling the RAM in some way. But that's what these machines did. Mr. Chambers also spoke of the... Let me flip over, if there are no questions on the syringe sensing, let me flip back for a moment to the front load patents. Mr. Chambers spoke of this as, some of these patents as being method claims. And indeed, some of them are method claims. And as if that was a silver bullet against disclosure, against the written description requirement. The question in the method claim phrase is, how would they do that without a pressure trap? How would they attach this syringe to the machine? How do you do that? How do you go from this syringe, which is translucent and relatively thin, and it goes on the top, how do you affix this to this machine, without this pressure jacket, in a way that satisfies all the things that the pressure jacket does for them? How do you attach it? How do you make the syringe strong enough to withstand the pressures? The different pressures that are associated if you hold it from the rear. How do you make it transparent enough? The thicker you make this, the more opaque it becomes. How do you get it transparent enough so you can see air bubbles in the syringe? How do you guide this on? How do you make sure this goes on the machine without the ram, without the inside of the syringe touching the ram, that is, in their system, sticking out through the middle? How do you make sure that that doesn't happen when you insert the syringe? So you've got these issues. How do you do it? The district court pointed these out. What do you do about sterility? What do you do about attachment? What do you do about transparency? Let alone, what do you do about pressure, the different sorts of pressures that are going to be on the system? Your Honor, I'll reserve. I won't reserve any time for the cross appeal. I'll just use the remaining time. I think I reserved a minute for the cross appeal. I'm giving the appellant three minutes extra. And so, well, I'll give you three minutes extra now. I don't, if you want to use it, if you want to save it for a cross appeal, it will only be to respond, which he may not give you anything to respond to. And secondly, I think you had three issues, one of which would argue for the same result, advantage ship, namely invalidity, so I don't think that's the proper cross appeal. So with all of those qualifications, you can either use three minutes now or save them, and they may not be of value to you. You make the choice very easy. Could I ask a question that goes to an issue we haven't discussed, and that is the inequitable conduct issue? And that is one of the cross appeals. Yeah. And you think that that needs to be decided by the trial court? Your Honor, this may be a triumph, if we think of analytical purity, and that is an inequitable conduct claim is a separate claim from the validity. I understand that. And the question is... It's a practical matter what's in play. This, I take it, is not a conditional cross appeal. I mean, you're not saying... I mean, I didn't see any indication that it was... No, Your Honor, it's certainly... The issues relating to claim construction and advantage ship and those things would be in that if you affirm the district court, you don't need to reach those issues. But on the invalidity claim, the question is what additional relief... Inequitable conduct, you mean. On the inequitable conduct claim, what additional relief might be available? And there are two kinds. One, the patents could be held invalid more broadly. That is, a pressure jacket of claims and things like that could be held invalid more broadly. But is that of any direct significance to your client in this case? I don't believe so, Your Honor. All right. So that's really... It's a practical matter. And the other question is fees and costs. Which haven't been raised yet. Which haven't been raised yet because they're part of the inequitable conduct claim which the court held was removed. When you say they're part of the inequitable... The fee... You haven't made a fee application yet. You plan to? We have not filed a fee application. And you plan to predicate the fee application on inequitable conduct? Correct, Your Honor. And presumably, I don't suppose there's anything that would prevent the district court from saying, well, inasmuch as you have predicated your fee application on inequitable conduct, I will now take some kind of look at inequitable conduct. The court wouldn't be barred from doing that by our failure to say that she was required to do it at this point, correct? If the court was simply to affirm that Judge Beckwith has dismissed the inequitable conduct claim as moot. Right. For now, because there's no reason so far before her, because the fees are not before her, that she should think that it is a live issue. It could become live. Something that's moot now can become live later, I suppose. I suppose the judge has indeed entered final judgment. Yeah, but the fees question is separate from the final judgment, I take it. So that has a life of its own. I would agree with that. Thank you. Thank you, Mr. McGuff. Mr. Chambers has three minutes. Thank you, Your Honor. With respect to this capacity issue in the 858 pattern, we repeat that the syringe sensing patterns are replete with examples and discussion of the interrelationship of the control of the injector based on offset values, based on capacities, based on end-to-travel positions, et cetera, et cetera. Mr. McGuff takes a commercial device and says, well, how are you going to change this to eliminate the pressure jet? How are you going to attach these things on and on? How are you going to hold it from the rear? We have examples, for example, in the 261 pattern, in figure 15, which shows the identical latching and sealing construction that Nedrad uses. 261 pattern is a very narrow claim to those locking flanges and the sealing structure in a particular spatial relationship between them. In figure 15, it's used at the front of the syringe. In Nedrad's injector, it's used at the back. But it's the same attachment mechanism where you have outwardly extending flanges which interlock with interior slots and the spatial relationship that the opening at the end of the syringe goes into is such that you urge the sealing flange against it. Nedrad has taken that exact construction and incorporated it in their commercial product. They had questions about, well, how do you design it so it doesn't touch the ram? You just have the plunger at the end of the syringe, so it's not going to touch the ram. How do you design it so it's transparent? Well, the patterns say nothing about transparency. There's no limit in these claims. There's no discussion at all about either the transparency or lack of transparency. Figure 15 says, and the accompanying text in column 13 says if you want to eliminate the pressure jacket, or at least if you add portions outside of the pressure jacket, all you have to do is make the syringe stronger. It's column 13, line 36. Make the syringe stronger or add reinforcing ribs. In Nedrad's 858 patent, they say exactly the same thing. So everybody understands that this is how it's done. Now, with respect to the questions from Judge Rader, as we brought this issue here and the claims have to be commensurate in scope, I would like to suggest that this court sees multiple Markman appeals. We see multiple issues where limitations are not read into the claims, and Philip said that. And if then we say you've got to show in your written description what that limitation, when not read in your claims, you have to show that you had that in the test case. You have to enable it, don't you? That's the catcher. You have to show you invented what you claim. What's wrong with that? But you don't have to show that you invented every possible variation. No, as long as it's within the knowledge of one of skill in the art, and one of skill in the art could, with what you have disclosed, without undue experimentation, reach other embodiments, as Judge Bryson explained to us earlier. You don't have to, with great particularity, get every detail. But we've got a circumstance where you expand your claims beyond what you can show you enabled. Don't we? No. Well, that's what the court found, and you haven't showed us any great error in the court's finding. It has plenty of record evidence to base that on. The claim is a claim as it was originally drafted. I understand. They come and say, you've got to read a limitation into that claim. That claim, read on that specification, it was enabled. That's the question, isn't it? Who is it in it? You could have, for example, in a situation that would be similar to this case, you first claim, let's say, a hybrid car, and you describe a particular hybrid car that gets 60 miles to a gallon, and then you discover somebody else has a different design of car that gets more than 60 miles to a gallon, and then you say, okay, I'm going to now come in with a claim which is to any vehicle that gets more than 60 miles to a gallon. Well, you've enabled that in the sense that you have one such vehicle, but you certainly wouldn't argue that that satisfies all your enablement requirements so that you can reach any vehicle, no matter how designed, no matter how made, that happens to get 60 miles per gallon, would you? That is not this case. Well, for your sake, it better not be. But I mean, what's the difference? Because that's the mechanical arts one could say. There are cases, and it's a Raleigh versus Moore situation, where you can have a mechanical claim that is so broad that it covers any way of performing that. These claims are narrow claims. They are not broad claims. Whether or not you have a pressure jacket, just because they read on a pressure jacket doesn't mean they cover any way of front-loading. We have products that do not use these patents that are front-loaded. Medrad has products that do that. In the 261 patent, you could eliminate those flanges, and you would not infringe. You could eliminate the ceiling flange, and you would not infringe. You could change the spatial relationship between the flanges and the ceiling flange, and you would not infringe. We are not saying we cover any and every injector that front-loads. Mr. Chambers, I think we have your case. We'll take the case under advisement. And we'll let you go. Next case.